UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

P.K., as parent and
next friend of J.K.,

        v.                          Civil No. 08-cv-150-JL
                                    Opinion No. 2011 DNH 036
Middleton School District


**OPINION AND ORDER**

P.K., acting on behalf of her minor son, J.K., and
proceeding pro se, has brought this action under the Individuals
with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq.
("IDEA").  Under 20 U.S.C. § 1415(i)(2)(A), P.K. seeks judicial
review of the New Hampshire Department of Education's decision
that the defendant, Middleton School District, provided a free
and appropriate public education to J.K., and that P.K. is not
entitled to reimbursement of her expenses in placing him in a
private school instead.  Jeremy K. v. Middleton Sch. Dist., IDPH-
FY-08-08-013, slip op. at 3-4 (N.H. Dep't of Educ. Dec. 17,
2007).  This court has subject-matter jurisdiction under 20
U.S.C. §§ 1415(i)(2)(A) and (3)(A).

Pursuant to this court's local rule for § 1415(i) cases, the
parties have filed the administrative record of the proceedings
before the hearing officer, together with a joint statement of
material facts.  L.R. 9.3(b), (d).  Each party has also filed a

list of disputed facts, a decision memorandum, and a reply to the
other party's decision memorandum.  L.R. 9.3(d), (e).  Neither
party has requested an evidentiary hearing or, for that matter,
oral argument, despite this court's offer to conduct it at the
request of either party.  Based on the administrative record and
the parties' written submissions, the court affirms the hearing
officer's decision.

I.    **Applicable legal standards**

"The IDEA provides funding to each state 'to assist [it] to
provide special education and related services to children with
disabilities,' provided that '[a] free and appropriate public
education is available to all children with disabilities residing
in the state.'"  Mr. I ex rel. L.I. v. Me. Sch. Admin. Dist. No.
55, 480 F.3d 1, 4 (1st Cir. 2007) (quoting, with added
bracketing, 20 U.S.C. § 1411(a)(1)).  A state discharges this
duty "as long as the program that it offers to a disabled student
is 'reasonably calculated' to deliver 'educational benefits.'"
C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279,
284 (1st Cir. 2008) (quoting Hendrick Hudson Bd. of Educ. v.
Rowley, 458 U.S. 176, 207 (1982)).  Generally, this requires the
state "to identify children who may be disabled, evaluate each
child to determine his or her eligibility for statutory benefits,

2

and develop a customized [individualized educational program] to ensure that the child receives a level of educational benefits commensurate with a" free and appropriate public education.  Id. at 285 (citing 20 U.S.C. §§ 1412(a)(3)-(4), 1414(a)-(b)).

P.K. does not dispute that the school district developed an adequate individualized educational program ("IEP") for J.K. to address his stated needs, including a severe allergy to latex.[1] Instead, she asserts that the school district deviated from the IEP by exposing J.K. to "continuous risks of harm"--principally, products which P.K. says contain latex--while he was in the fourth grade at its elementary school, and that this amounted to a denial of a free and appropriate public education.

Again, the hearing officer ruled to the contrary, and P.K., as the party challenging that decision, bears the burden of showing that it was incorrect.  See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991 (1st Cir. 1990).  In reviewing the decision, this court "exercises its discretion, informed by the record and by the expertise of the administrative agency and the

---

[1]The school district formulated both an IEP and an "Individualized Health Plan," or "IHP," for J.K.  Though each was memorialized in a separate document, the parties have essentially treated them as one and the same throughout this litigation and assumed, as a consequence, that the IHP should be treated just like an IEP for purposes of the IDEA and its implementing regulations.  The court will take the same approach.

school officials, as to how much deference to afford the administrative proceedings." Sch. Union No. 37 v. Ms. C., 518 F.3d 31, 35 (1st Cir. 2008).  This level of scrutiny "falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008).

As this court has observed, the court of appeals has not yet "addressed the question of just how far a school district may deviate from the terms of an IEP before it fails to provide a" free and appropriate public education. Burke v. Amherst Sch. Dist., 2008 DNH 210, 19 (McAuliffe, C.J.).  As Burke also observed, though, the consensus of other federal courts of appeals is that "even a demonstrated IEP implementation failure, without more, does not constitute a per se denial of a [free and appropriate public education] or a per se violation of the IDEA." Id. at 24-25 (citing Van Duyn ex rel. Van Duyn v. Baker Sch. Dist., 502 F.3d 811 (9th Cir. 2007), and Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341 (5th Cir. 2000)); see also A.P. v. Woodstock Bd. of Educ., 370 Fed. Appx. 202, 205 (2d Cir. 2010); Mark C. Weber, Special Education Law and Litigation Treatise § 5.5, at 5:9-5:10 (3d ed. 2008).[2]

---

[2]There is authority to the contrary.  See, e.g., Van Duyn, 502 F.3d at 826-27 (Ferguson, J., dissenting) ("the failure to

Instead, courts generally hold that only

> a material failure to implement an IEP violates the
> IDEA.  A material failure occurs when there is more
> than a minor discrepancy between the services a school
> provides to a disabled child and the services required
> by the child's IEP . . . .  [T]he materiality standard
> does not require that the child suffer demonstrable
> educational harm in order to prevail.  However, the
> child's educational progress, or lack of it, may be
> probative of whether there has been more than a minor
> shortfall in the services provided.

Van Duyn, 502 F.3d at 822; accord Bobby R., 200 F.3d at 349 ("a

party challenging the implementation of an IEP must show more

than a de minimis failure to implement all elements of that IEP.

and, instead, must show that . . . authorities failed to

implement substantial or significant portions of the IEP");

Burke, 2008 DNH 210, 25-26.

This was essentially the same standard applied by the

hearing officer in this case, who, citing Van Duyn, ruled that

> [a] failure to implement a student's IEP must be
> material before it will be found to have violated the
> [IDEA]; there must be more than a minor discrepancy
> between the service provided and the service required
> by the IEP.  Failure to strictly follow the IEP does

---

implement any portion of the [IEP] to which the school has
assented is necessarily material"); David Ferster, Broken
Promises:  When Does a School's Failure to Implement an
Individualized Education Program Deny a Disabled Student a Free
and Appropriate Public Education, 28 Buff. Pub. Int. L.J. 71, 76
(2010) (advocating "a per se approach to implementation cases,"
while acknowledging that the materiality standard is "a
permissible interpretation of [the] IDEA").

> not constitute a denial of a [free and appropriate
> public education].

Jeremy K., slip op. at 4.  While P.K. asserts that this amounted

to "an incorrect standard," she also acknowledges that "an IEP

must not be perfectly followed to be compliant," and goes on to

argue that the school district's conduct "in exposing [J.K.] to

. . . continuous risks of harm [was] a material breach"--which

appears to more or less adopt the materiality standard used by

the hearing officer.  Moreover, P.K. does not articulate or

provide supporting argument for any other standard to assess when

deviations from an IEP amount to the denial of a free and

appropriate public education.  The court will therefore apply the

materiality standard here.


## II.  **Background**

In relevant part, J.K.'s IEP for the 2006-2007 school year

provided that the school district would "monitor the use of

materials in school to help maintain a latex safe environment"

and to "endeavor to make [his] school environment as latex free

and safe as possible for him.  Any supplies given by the school

will be latex free, and his work area(s) will be kept latex

safe."  The IEP further stated that J.K. would "need [a] seat

belt on [the] bus for his safety."  The IEP also called for an

array of special education and related services, including
additional reading, writing, and articulation exercises and
physical and occupational therapy.  (J.K.'s educational
disabilities were identified as "speech/language" and "other
health impaired.")[3]

J.K.'s IHP for the 2006-2007 school year provided also, in
relevant part, that staff were to inspect classrooms "for
possible latex products and remove as many as possible to
maintain a latex free environment," that latex-free pencils would
"be supplied to all students" at J.K.'s grade level, that the
parents of those students would receive a letter "informing them
of the need for a latex safe/allergy aware classroom," to "notify
students and parent[s] to make accommodations as necessary" when
"latex products/equipment [were to be] used in projects," and,
finally, that "[l]atex balloons will be banned from any
school/after school functions."

_____

[3]P.K. argues, as she did to the hearing officer, that the
"IEP team refuses to code J.K. for the learning disability of
dyslexia," even though he was diagnosed with it as early as 2004.
The hearing officer ruled that "[w]hether to add a particular
code to a student's IEP is for the team to determine," but that
"the issue was raised for the first time" at the due process
hearing. Jeremy K., slip op. at 4.  P.K. has pointed to nothing
in the record to the contrary (and the records of the IEP team's
meetings contain no reference to this issue).  So this argument
is without merit (insofar as it is not moot, since P.K. does not
explain how coding J.K. as dyslexic would have affected the
content of the IEP, which, again, she has not challenged).

The hearing officer found that these "[e]xtensive policies and procedures for maintaining a latex-safe environment" were "instituted on a school-wide basis . . . .  [T]he school purchases latex-free supplies, prohibits balloons and other items containing latex, and has sent informational letters home with all middle school students."  Jeremy K., slip op. at 1-2.  The hearing officer also found that "if there was any question at all as to whether an item brought into the school contained latex, staff consistently erred on the side of caution by removing the item.  Further, on school-wide basis . . . , there were protocols and training for responses in the event of actual exposure to latex allergens."  Id. at 3.

P.K. does not dispute any of these findings.  Instead, she argues that, despite the ban on latex items, they made their way into the school on a number of occasions during the 2006-2007 academic year, yet "there was no corrective, informative or disciplinary action taken."  Of these eight incidents, four arose when items potentially containing latex (erasers in three cases, and balloons brought by an eighth-grade student in the other) had been introduced into the school building.  The hearing officer found that, in each of these cases, J.K. had not come into contact with the items, which were immediately removed from his vicinity as soon as their presence was recognized (the balloons

were never brought anywhere near him in the first place).  The
remaining four incidents arose when items which the hearing
officer found <u>not</u> to contain latex (newspapers, paper mache, a
guidance counselor's crutches, and poinsettias displayed in the
office) had been brought into the school, and the hearing officer
found that J.K. had not come into contact with any of them
anyway.

P.K. disputes only two of these findings.  First, she argues
that, while the hearing officer found that J.K. had never been
exposed to latex while at school, he in fact had an allergic
reaction in one of the complained-of instances, when he went to
the school nurse's office complaining of nausea and ended up
vomiting.  In declining to attribute this to latex exposure,
however, the hearing officer specifically relied on testimony
from the school nurse that J.K. had not presented with the
symptoms of an allergic reaction, but constipation.  P.K. points
to no contrary evidence.

Second, P.K. argues that poinsettias "are in fact dangerous
for latex allergic individuals."  But the hearing officer
specifically relied on testimony from the school nurses that
poinsettias do not contain latex, and could cause an allergic
reaction only "if the stem was cracked and the white substance
[inside] was to come out."  The evidence on which P.K. relies

(Internet news articles reporting on a study where blood samples from latex allergy sufferers were mixed with poinsettia extract) is not to the contrary.  To overcome a hearing officer's factual findings on an IDEA appeal, a party must provide at least some "sound reason," Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1990), and P.K. has not done that.

III. **Analysis**

A.   **The hearing officer properly found that the District did not deprive J.K. of a free and appropriate public education**

As just discussed, the hearing officer supportably found that items containing latex were brought into J.K.'s school only 4 times during the entire 2006-2007 academic year, that he was not exposed to them on any of those occasions, and that, in each case, the items were removed from J.K.'s vicinity as soon as their presence was recognized.[4]  This does not constitute a material violation of the IEP.  Indeed, this does not even amount to a literal violation of the IEP, which does not mandate an absolutely latex-free facility, but simply requires the District to "monitor the use of materials in school to help maintain a

---

[4]In light of the supportable finding that J.K. had never been exposed to latex at school during the 2006-2007 academic year, there is no need to address P.K.'s claim that "[a] latex allergy becomes worse with each exposure and increases the chance that the next reaction will be severe or anaphylactic."

latex safe environment" and to "endeavor to make [J.K.'s] school

environment as <u>latex free and safe as possible</u>" (emphasis added).

P.K. also claims that the District violated the IEP by

allowing J.K. to ride on a bus without seatbelts while on a field

trip with his classmates.  The hearing officer found that this

had in fact happened, even though J.K.'s IEP called for him to

wear a seatbelt on the bus due to his unusually high risk of bone

fractures.  <u>Jeremy K.</u>, slip op. at 3.  The hearing officer also

found, however, that "[n]o injury occurred" and that the

responsible staff member "was subsequently made aware of the

mistake, and did not make it again."  <u>Id</u>.  Thus, the hearing

officer concluded that this sole instance "where an IEP provision

was not strictly followed [did] not give rise to a deprivation

of" a free and appropriate public education, "particularly since

there was no harm alleged or proven."  <u>Id</u>.

P.K. argues, with some justification, that the fact that

J.K. was not injured as a result of not wearing a seatbelt as

prescribed by the IEP "does not negate the violation, nor the

implications of the risk" to which he was exposed.  Indeed, "the

materiality standard does not require that the child suffer

demonstrable educational harm in order to prevail" on a claim

that deviations from an IEP amount to the denial of a free and

appropriate education.  <u>Van Duyn</u>, 502 F.3d at 822.  So if this

were the case P.K. says it is--where a school's "constant and

numerous violations" of an IEP "knowingly and willfully expose[d]

[the student] to unnecessary risk of grievous harm"--then a

denial of a free and appropriate education could legitimately be

found, despite the fortuitous fact that the harm was never

actually realized.

But that is plainly not this case.  There were not "constant

and numerous" violations of P.K.'s IEP.  In fact, there was only

one--where J.K. was allowed to ride on a bus without a seatbelt

for a single trip--because, as just discussed at length, the four

occasions when items containing latex were brought into the

school and removed as soon as their presence was detected did not

transgress even the literal terms of the IEP.[5]  Giving the

appropriate level of deference to the hearing officer's decision,

see Ms. C., 518 F.3d at 35, this court cannot say she was wrong

_____

[5]At the due process hearing, P.K. complained about four
other incidents which allegedly jeopardized J.K.'s safety.  The
only one of those incidents P.K. even mentions in her submissions
here, however, is the one described by the hearing officer as an
occasion where J.K. "was unable to use the bathroom in the
nurse's room," so he used the one at the back of the classroom
instead."  Jeremy K., slip op. at 2.  But P.K. does not explain
how this violated any provision of the IEP or the IHP, and that
proposition is not apparent to the court.  P.K. does state that
having to use the class bathroom had "serious social implications
for J.K. with his peers" and "violates [his] right to
confidentiality," but those concerns, however valid, do not
transform the incident into a violation of the IDEA on any
recognizable theory.

to conclude that J.K. received a free and appropriate public education despite this single deviation from the IEP.  See Burke, 2008 DNH 210, at 25 (upholding a hearing officer's decision that the school's failure to videotape and review the student's interactions with her peers, as prescribed by the IEP, did not deny her a free and appropriate public education, where the school followed all of the IEP's other provisions).

**B.   P.K. is not entitled to private school tuition reimbursement**

The hearing officer also concluded that, even if the District's alleged omissions did deny J.K. a free and appropriate public education at its public elementary school, P.K. is nevertheless not entitled to reimbursement for her expenses in placing J.K. in a private school instead.  The IDEA authorizes courts "to order school authorities to reimburse parents for their expenditures on private special education for the child," but only if the court "concludes both the public placement violated [the] IDEA and that the private school placement was proper under the Act."  Mr. I, 480 F.3d at 23 (quotation marks omitted).  If these criteria are satisfied, reimbursement is "a matter of equitable relief, committed to the sound discretion of the [district court."  Id. (quotation marks omitted).

As P.K. acknowledges, "'a private school placement must be
reasonably calculated to enable the child to receive educational
benefits' to constitute a proper placement" for reimbursement
purposes.  Id. at 24 n.22 (quoting Rafferty v. Cranston Pub. Sch.
Comm., 315 F.3d 21, 26 (1st Cir. 2006) (additional quotation
marks omitted)).  Furthermore, to meet this standard, the private
school must "offer at least some element of the special education
services in which the public school placement was deficient."
Id. at 24 (quotation marks omitted).

Following the 2006-2007 academic year, P.K. withdrew J.K.
from the public elementary school in the District and enrolled
him at Tri-City Christian Academy, a private school in
Somersworth, New Hampshire.  The hearing officer found that "Tri-
City does not provide special education and related services" and
noted evidence that the school was not entirely "safe from latex
exposure," including that its "students were permitted to decide
whether they wanted to have balloons inside the school building,
and . . . on at least one occasion, balloons were in fact on the
premises."  Jeremy K., slip op. at 3.

P.K. does not challenge these findings.  Instead, she argues
that Tri-City was intended simply as "an interim placement until
the issues in dispute in this case were resolved," because
leaving J.K. at the public elementary school "would have been

14

inappropriate and potentially dangerous given the safety concerns involved." But even assuming--contrary to the foregoing discussion--that this is true, the court of appeals rejected essentially the same argument in Mr. I.

There, the parents of a sixth-grader who needed one-on-one tutoring and other special education services as a result of her Asperger's syndrome--and who had attempted suicide--placed her in a private school after three months had passed and the public school district had yet to locate a tutor. 480 F.3d at 7. The private school, however, did not provide the student with any of the special education services she needed. Id. at 24-25. In upholding the district court's conclusion that the private school placement was not "proper" so as to entitle the parents to reimbursement, the court of appeals explained,

> We sympathize with the family's emotional upheaval, and
> we certainly do not condone the district's apparent
> inattention to the task of locating a tutor for [the
> student] as it repeatedly promised it would. And we
> cannot doubt that [the private school], where [the
> student's] sister had prospered and where [the student]
> herself had expressed interest in attending even before
> the events [leading up to her suicide attempt], must
> have seemed an attractive solution to an exceedingly
> difficult set of circumstances. But these
> considerations simply cannot change the fact that [the
> private school] . . . simply does not provide the
> special education services . . . prescribed.

Id. at 25. The same observations are appropriate here.

Though there seems to be no reason to question the sincerity of P.K.'s concern for J.K.'s well-being, the fact remains that he was enrolled at a private school that provided him with <u>none</u> of the many special education services he had been receiving in the public school--and, for that matter, that had allowed students to bring balloons on to the premises at least once.  Without affording him at least "some element of the special education services" he required, J.K.'s placement at Tri-City was not "reasonably calculated to enable him to receive educational benefits."  Id. (quotation marks and emphasis omitted).

Indeed, to rule "otherwise would, in essence, embrace the argument . . . that the IDEA entitles a parent, at public expense, to 'seek any alternative placement she wishes if the public education is inadequate'"--an argument that the court of appeals has squarely rejected more than once.  Id. (quoting Rafferty, 315 F.3d at 27).  So, even if the school district had denied J.K. a free and appropriate public education, P.K. would still not be entitled to reimbursement for her expenses in sending him to Tri-City, which was not a "proper" placement for him.

## III. <u>Conclusion</u>

For the foregoing reasons, this court affirms the decision of the New Hampshire Department of Education, and otherwise denies P.K.'s request for tuition reimbursement.  The clerk shall enter judgment accordingly and close the case.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 9, 2011

cc:  P.K., pro se
     Melisa A. Hewey, Esq.